# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 18, 2014 Session

## STATE OF TENNESSEE v. COTY SHANE SMITH

**Appeal from the Criminal Court for Monroe County**
**No. 12136     Amy F. Reedy, Judge**

_____

### No. E2014-00490-CCA-R3-CD - Filed September 26, 2014

_____

Defendant, Coty Shane Smith, pled guilty to one count of second degree murder. The trial court sentenced him to an effective sentence of twenty-five years in the Tennessee Department of Correction. On appeal, Defendant contends that the trial court imposed an excessive sentence by improperly applying an enhancement factor and imposing a sentence that is disproportionate to the sentence received by one of the co-defendants in his case and to sentences received in other second degree murder convictions throughout the state. After a thorough review of the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Joseph Crabtree, Athens, Tennessee, for the appellant, Coty Shane Smith.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilbur, Senior Counsel; Steven Bebb, District Attorney General; and Wayne Carter, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Factual and Procedural Background*

This case arises out of the murder of the victim, Luther "Luke" Vineyard. A Monroe

County grand jury indicted Defendant, Lorenz James Freeman, Jr., Joshua Lee Steele, and Jessica Renee Payne for conspiracy to commit aggravated robbery and felony murder. Mr. Freeman and Mr. Steele were also indicted for aggravated robbery. Ms. Payne was indicted for criminal responsibility for aggravated robbery. Defendant entered a plea of guilt to second degree murder in exchange for the dismissal of the remaining charges.[1] The trial court was to determine the manner of service of the sentence at a sentencing hearing. At the guilty plea hearing on July 1, 2013, the State announced the factual basis underlying the guilty plea as follows:

> [O]n March the 4th, 2012, that Mr. Freeman, [Defendant] and Ms. Payne had an attempt to go and rob the victim in this case, a Mr. Vineyard. That they went to his place of residence, that the female, Ms. Payne, stayed in the vehicle and the two gentlemen get out. That they approached his residence when another vehicle shows up and they get spooked and leave and so there's no event that happens at that point. They go to a residence where they get hold of Mr. Steele. At that point, sometime later on, and Ms. Payne does not return with them, but Mr. Freeman, [Defendant], and Mr. Steele go back to Mr. Vineyard's residence, and at that point they go in [wearing masks] and it is Mr. Freeman and Mr. Steele who are the ones that hold on to the victim Mr. Vineyard and he's hit in the head with a piece of iron, a piece of wrought iron,[2] and eventually dies - -
>
>     . . . .
>
> [Defendant] was involved in the planning, [Defendant] goes through the house, the house is ransacked looking for what we expect they were looking for cash, there were some rumors going around that the victim Mr. Vineyard had a large amount of cash that was there. After this happens they leave, go back, and there's some other conversations that goes on. Fortunately law enforcement gets on top of this thing fairly quickly and does a[n] outstanding job of investigating the case and statements are taken from Mr. Freeman and Mr. Steele, and Ms. Payne that would support the facts that I've outlined to the court.

---

[1] The remaining defendants also entered pleas of guilt. According to the transcript of the guilty plea hearing, Mr. Steele and Mr. Freeman pled guilty to second degree murder with the trial court to determine the length and manner of service of the sentence. Ms. Payne pled guilty to facilitation to commit second degree murder in exchange for a sentence of ten years, suspended to probation with pre-trial jail credit from March 9, 2012, to July 1, 2013.

[2] At the sentencing hearing, the weapon was described as "rebar."

(Footnote added). Based upon the evidence, the trial court accepted Defendant's guilty plea.

Subsequently, on September 20, 2013, Defendant filed a motion to withdraw his guilty plea. On October 30, 2013, trial counsel filed a motion to withdraw. Trial counsel asserted that representing Defendant on the motion to withdraw the guilty plea was likely a conflict of interest due to the fact that it was, in part, based on the allegation that trial counsel did not adequately provide Defendant with information to make a knowledgeable decision about the entry of the guilty plea.[3]

The trial court held a hearing on the motion to withdraw the guilty plea. At the hearing, Defendant explained that, prior to March of 2012, he had been charged with theft of property valued under $500. Defendant pled guilty to that charge but was not represented by an attorney.

Defendant explained that during the investigation of the incident at issue herein, he never admitted that he intended to cause injury or death to the victim or that he actually inflicted the injuries to the victim. Additionally, he informed investigators that he did not understand why or how he could be responsible for the death of someone when he did not perform the acts that resulted in the death. However, Defendant admitted on cross-examination that he understood after conversations with trial counsel that he could be responsible for someone else's actions in the perpetration of a felony. Additionally, Defendant admitted that he was present during the robbery.

Defendant explained that he wanted to file the motion to withdraw the plea because he felt like he made a mistake in entering the plea. Defendant explained that he "just felt like . . . [he] didn't have [any] part in the death and so [he] shouldn't . . . be charged for something that [he] had nothing to do with."

At the conclusion of the hearing, the trial court stated that it considered the motion and "did not find that the balance of the factors to be considered weighed in the defendant's favor." Specifically, the trial court determined that "there was no confusion or misunderstanding of the terms of the agreement." The trial court noted that Defendant "had a fear of the sentence and 'woke up' afraid of the fact as he testified which amounted to a change of heart as to the possible penalty he faced." As a result, the trial court denied the motion to withdraw the guilty plea.

---

[3]The motion to withdraw as counsel does not appear in the technical record. The order of the trial court denying the motion to withdraw the guilty plea states that the "motion was denied on the record on November 1, 2013 after the State of Tennessee indicated they would not be calling counsel for the defendant as a witness" at the hearing on the withdrawal of the guilty plea.

The trial court set the matter for sentencing. At the sentencing hearing, Detective Captain Doug Brandon of the Monroe County Sheriff's Department testified. Detective Captain Brannon testified that he was the lead investigator in the case. He explained that law enforcement responded to a call at the home of the victim. A neighbor reported that he found the victim dead in his home. Detective Captain Brannon described the home as a small log cabin that "had been pretty well ransacked . . . as if someone was searching for something." The "walls had been torn apart, flooring had been ripped up."

Detective Captain Brannon explained that the victim had a visible head wound and the autopsy later revealed he had been struck in the head several times with a hard object. The autopsy also indicated that "positional asphyxiation," or an inability to move his body, was a "contributing factor" to the victim's death.

Officers received information during the investigation that led to the defendants. Mr. Steele was approached by officers and was cooperative, describing the events as "a planned robbery." Mr. Steele explained that he was not initially involved in the robbery. Defendant, Ms. Payne, and Mr. Freeman went to the victim's home to rob him and were interrupted when someone came to the house unexpectedly. They abandoned the plan and went to Mr. Steele's house, which was located a few miles away from the victim's home. Mr. Steele was brought into the conspiracy at that point and returned to the victim's home with Mr. Freeman and Defendant. Ms. Payne stayed with Mr. Steele's girlfriend at the home of Mr. Steele.

When the men arrived at the home of the victim, they kicked in the door, restrained the victim with "flexicuffs" or "flex-cuffs," and Mr. Steele beat the victim with a piece of "rebar," a "piece of steel normally used to reinforce concrete." The men tore the house apart looking for narcotics and money.

Detective Captain Brannon described Defendant as the "least cooperative" of the individuals involved in the incident. When investigators spoke with Defendant, he "pretty much denied everything." Detective Captain Brannon testified that Defendant "placed himself out of the picture . . . he placed himself as having not made any physical contact with the victim, having not done anything but perhaps being present." However, Detective Captain Brannon explained that the victim's home was very small and that he "would find it hard to believe that any one person anywhere in that house was not aware of what was going on in that front room, either visually, verbally, or audi[torily]. . . ."

The victim's brother, Larry Vineyard, testified at the hearing. He testified that he went to his brother's home with his two grown sons after the murder in an attempt to clean up the home. He described it as "ransacked." The couch was "soaked in blood," and there was a "puddle of blood probably a foot or foot and a half" where the victim's face had been.

Mr. Vineyard and his two sons tried to clean up the home but eventually boarded up the house after cleaning on several occasions. Charlene Adams, the victim's niece, also testified about the negative effect that the victim's murder had on the family and surrounding community.

Jennifer Bledsoe, of the Monroe County Sheriff's Department, testified that she was the Captain of the jail that housed Defendant at the time of the sentencing hearing. She testified that Defendant had been given a position in the jail in which he was permitted to clean the hallways, a position reserved for inmates who "have established they are a lesser risk than others." Additionally, he completed a program offered through the jail known as Team Dad, a parenting skills course.

Defendant testified at the hearing. At the time, he was twenty-seven. He apologized to the victim's family. He explained that he grew up with his grandparents and attended school until the 12th grade but did not graduate. He obtained his GED.[4] Defendant had one prior criminal offense, a misdemeanor theft of property valued under $500. He was on probation for that offense at the time he was arrested for the offense at issue.

Defendant explained that his theft conviction arose after he removed some "game cameras that [were] placed on my farm." Defendant "returned the cameras to the owner but he got a little upset because he couldn't hunt [on the property]." The farm was actually owned by Defendant's grandparents.

Defendant had two children. At the time of the incident, he was living with the children and their mother. Defendant ran his own business, a roofing company. He employed one of the other defendants.

Defendant explained his involvement in the offense. He admitted that he went to the home of the victim with the purpose of robbing the victim. However, Defendant stated injuring the victim or using a weapon were not part of the plan. The plan was to restrain the victim by placing "flexi-cuffs" on him. Defendant did not anticipate that the victim would be injured. In fact, Defendant explained that they had no intention of harming the victim and that the men disguised themselves prior to the robbery so that they would not be recognized by the victim. Defendant testified that he did not know that the victim had been injured until after they left the victim's home and returned to Mr. Steele's house.

At the conclusion of the sentencing hearing the trial court found that Defendant

---

[4]Interestingly, at the hearing on the motion to withdraw his guilty plea, Defendant testified that he attended school until 9th grade and did not have a GED or high school diploma.

"directed, instigated the entire event" and was a leader in the commission of an offense involving two or more criminal actors, applying enhancement factor (2). The trial court also found that enhancement factor (5) applied, that Defendant "treated, or allowed [the] victim to be treated, with exceptional cruelty during the commission of the offense" because Defendant was "tied up with these one time handcuffs" and "the position that he was left in allowed him to lay there and suffer while his home was torn apart." The trial court also noted that Defendant was on probation for that conviction at the time of the offense, factor (13). The trial court did not find any mitigating factors. After applying the enhancement factors, the trial court sentenced Defendant to twenty-five years in incarceration to be served at 100% as a violent offender.

Defendant appeals.

*Analysis*

On appeal, Defendant contends that the trial court imposed an excessive sentence. Specifically, he argues that the trial court erred by applying enhancement factor (5), that Defendant treated or allowed the victim to be treated with exceptional cruelty, because the proof was "unrefuted" that Defendant was unaware that the victim was injured. Additionally, Defendant complains that his sentence is disproportionate to that of co-defendant Freeman, who received a sentence of twenty years, and other similarly situated homicide convictions. The State disagrees.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. T.C.A. § 40-35-401, Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

At the conclusion of a sentencing hearing, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any

statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. *See* T.C.A. §§ 40-35-102,-103, -210; *see also Bise*, 380 S.W.3d at 697-98.

Tennessee Code Annotated section 40-35-114 contains a non-exclusive list of enhancement factors. The weighing of both enhancement and mitigating factors is left to the trial court's sound discretion. We note that even a trial court's misapplication of an enhancement or mitigating factor in imposing a sentence will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W. 3d at 709. Here, Defendant asserts that the trial court was in error by imposing a sentence of twenty-five years on the basis of three enhancement factors and no mitigating factors.

At the conclusion of the sentencing hearing, the trial court applied enhancement factors (2), (5), and (13) in sentencing Defendant to a sentence of twenty-five years in incarceration. *See* T.C.A. § 40-35-114(2), (5), (13). Defendant does not challenge the trial court's application of enhancement factors (2), that "defendant was a leader in the commission of an offense involving two (2) or more criminal actors," or (13), that defendant was "[r]eleased on probation" at the "time the felony was committed." T.C.A. § 40-35-114(2), (13). Instead, he challenges the application of enhancement factor (5), "[t]he defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense." T.C.A. § 40-35-114(5).

To support his argument on appeal, Defendant insists that because he did not "allow" the victim to be treated with exceptional cruelty during the commission of the offense, the trial court improperly applied this enhancement factor. The State, on the other hand, cites this Court's opinion in *State v. Ramone Gholston*, No. M2011-01989-CCA-R3-CD, 2012 WL 2151492, at *4 (Tenn. Crim. App. Jun. 14, 2012), *perm. app. denied* (Tenn. Sept. 27, 2012), to support the position that the trial court properly applied this enhancement factor even though Defendant did not "personally" treat the victim with exceptional cruelty.

In *Ramone Gholston*, the defendant was convicted of facilitation of first degree felony murder and facilitation of especially aggravated robbery. *Id.* at *1. The facts revealed that the victim, who was particularly vulnerable because he suffered from a condition known as Huntington's chorea, was beaten by a co-defendant and bled to death as a result of his injuries. *Id.* Mr. Gholston was sentenced to twenty-one years in incarceration by the trial court and appealed. *See State v. Ramone Pierre Gholston*, No. M2008-01283-CCA-R3-CD, 2010 WL 22810 (Tenn. Crim. App. Jan. 5, 2010). On appeal, the case was remanded for re-sentencing because the record failed to demonstrate that Mr. Gholston properly waived his ex post facto protections and agreed to be sentenced under the 2005 Amendments to the

Sentencing Act. *Id.* at *8. On remand, Mr. Gholston executed a waiver of ex post facto provisions and the trial court re-sentenced him, applying enhancement factors (2), (5), (6), and (13). *Ramone Gholston*, 2012 WL 2151492, at *2. The trial court again sentenced Mr. Gholston to twenty-one years in incarceration. Mr. Gholston appealed his sentence for a second time, arguing that his sentence was excessive because the trial court misapplied enhancement factors, including enhancement factor (5). Mr. Gholston argued that "the trial court should not have applied that factor because the jury's convicting him of facilitation meant the jury found that he did not personally participate in the crimes." *Id.* at *3. On review of the application of the enhancement factors, this Court's decision was constrained by the failure of Mr. Gholston to include a copy of the trial transcript in the record in either of his appeals. *Id.* at *4. Despite this failure, we noted:

> Regarding enhancement factor (5), that the victim was treated with exceptional cruelty, as noted by the State, a trial court may apply that factor if the defendant *allowed the victim to be treated* with exceptional cruelty during the commission of the offense. The defendant does not have to treat the victim with exceptional cruelty *personally*. As to [Mr. Gholston's] claim that the facts of this case do not demonstrate exceptional cruelty, we again conclude that we cannot determine whether the trial court properly applied enhancement factor (5) because [Mr. Gholston's] failure to include the trial transcript in the appellate record prevents us from conducting a complete de novo review. "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

*Ramone Gholtson*, 2012 WL 2151492, at *4 (emphasis added). As noted above, in *Ramone Gholston*, this Court ultimately made the conclusion to uphold the sentence on the basis of the failure of the defendant to include the trial transcript in the record, not on the proper application of enhancement factors, including enhancement factor (5). We note that the plain language of the statutory enhancement factor supports a trial court's application of enhancement factor (5) where the proof supports a finding that a defendant "allowed" the victim to be treated with exceptional cruelty. In other words, it is permissible, based on the plain language of the statute, to apply this enhancement factor where the defendant does not "personally" treat the victim with exceptional cruelty.

In the case herein, the proof at the sentencing hearing presented by Defendant was that he and the co-defendants went to the home of the victim with the intention of committing a robbery. Defendant testified that they did not have any intention to harm the victim, in his view, a fact supported by the fact that they wore disguises in order to prevent the victim from being able to identify them at a later time. However, Defendant admitted that they planned

to restrain the victim with "flexicuffs." Defendant testified that he had no idea that the victim had been injured until after the robbery concluded and the men returned to the home of Mr. Steele.

Detective Captain Brannon testified that the home of the victim was very small and he found it "hard to believe that any one person anywhere in that house was not aware of what was going on in that front room." Further, the testimony from the victim's brother indicated that the front room of the house had a large pool of blood and blood spatter from where the victim was beaten with a piece of rebar.

The trial court, in concluding that Defendant allowed the victim to be treated with exceptional cruelty, clearly accredited the testimony of the officer. The trial court heard the live testimony from the witnesses at the sentencing hearing and was in the best position to assess their credibility. At a sentencing hearing, the trial court, as the trier of fact, listens to the testimony and observes the demeanor of the witnesses. The appellate court gives great weight to the determinations made by the trial court concerning the credibility of witnesses. This Court will not interfere with the trial court's findings unless the record preponderates against them. *State v. Andrew Cross*, No. E2011-02106-CCA-R3-CD, 2012 WL 6734708, at *6 (Tenn. Crim. App. Dec. 28, 2012), *perm. app. denied* (Tenn. Apr. 9, 2013) (citing *State v. Melvin*, 913 S.W.2d 195, 202 (Tenn. Crim. App. 1995)). The evidence presented at the sentencing hearing supports the trial court's determination that Defendant allowed the victim to be treated with exceptional cruelty by his co-defendants.

Moreover, the trial court properly considered that Defendant was a leader in the commission of the offense. The trial court accredited Detective Captain Brannon's testimony that Defendant "directed, initiated [and] was the man behind the idea." Additionally, Defendant admitted that he was on probation at the time the offense was committed. These two enhancement factors alone would justify the imposition of a twenty-five year sentence.

We conclude that the sentencing decision was "within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Defendant pled guilty to second degree murder, a Class A felony, and faced a sentence of fifteen to twenty-five years as a Range I offender. T.C.A. § 39-13-210(c); T.C.A. § 40-35-112(a)(1). The sentence of twenty-five years, as imposed by the trial court, was within that range. The trial court did not abuse its discretion; Defendant is not entitled to relief.

Further, we determine that the sentence is not disproportionate. Defendant does not argue that the sentence is outside the appropriate range or that the trial court in some way deviated from the sentencing guidelines. In order to determine, in a non-capital case, if a

sentence is disproportionate and therefore in violation of the Eighth Amendment's guarantee against cruel and unusual punishment, the Tennessee Supreme Court has adopted the following analysis:

> [T]he sentence is initially compared with the crime committed. Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends—the sentence is constitutional. In those rare cases where this inference does arise, the analysis proceeds by comparing (1) the sentences imposed on other criminals in the same jurisdiction, and (2) the sentences imposed for commission of the same crime in other jurisdictions.

*State v. Harris*, 844 S.W.2d 601, 603 (Tenn. 1992). A successful challenge to a sentence utilizing a proportionality argument is "exceedingly rare." *Id.* at 602. Defendant's sentence herein, twenty-five years for second degree murder, does not meet the threshold inference of gross disproportionality.

Further, Appellant has cited to only one other case, a twenty-one year sentence imposed in *State v. Patrick Rico Edwards*, No. M2009-01277-CCA-R3-CD, 2011 WL 497444, at *3 (Tenn. Crim. App. Feb. 11, 2011), *perm. app. denied* (Tenn. May 26, 2011), in order to support his claim of disproportionality. In *Patrick Rico Edwards*, the defendant, who shot someone in the back during a drug transaction, entered a plea of guilt to second degree murder after a mistrial. The trial court sentenced him to twenty-one years in incarceration based on the application of enhancement factors (1), (9), and (10). *Id.* at *3. While the case herein and *Patrick Rico Edwards* certainly have distinguishable factual scenarios, and *Patrick Rico Edwards* was most certainly the primary aggressor whereas Defendant herein allowed the victim to be treated with exceptional cruelty by others, the fact of the matter remains that they both entered pleas of guilt to second degree murder and were both sentenced within the range for that offense. Defendant has not shown that his sentence is disproportionate. This issue is without merit.

*Conclusion*

Based upon our review of the record, we affirm the judgment of the trial court.

_____
TIMOTHY L. EASTER, JUDGE